## KIEFER–STEWART CO. v. JOSEPH E. SEAGRAM & SONS, Inc. et al.

### No. 10001.

United States Court of Appeals,
Seventh Circuit.

May 9, 1950.

Rehearing Denied June 13, 1950.

Paul Y. Davis, Harvey B. Hartsock, Gustav H. Dongus, Indianapolis, Indiana, Thomas Kiernan, New York City, White & Case, New York City, Davis, Baltzell, Hartsock & Dongus, Indianapolis, Indiana, of counsel for appellants.

Joseph J. Daniels, William G. Davis, John D. Cochran, Indianapolis, Indiana, Baker & Daniels, Indianapolis, Indiana, of counsel, for appellee.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

This is an action for damages resulting from alleged violations of Section 1 of the the Sherman Act and Section 7 of the Clayton Act, Title 15 U.S.C.A. §§ 1 and 18, brought pursuant to Title 15 U.S.C.A. § 15. A trial was had before a jury which returned a verdict in favor of the plaintiff in the amount of $325,000. Thereupon, a judgment was rendered for treble the amount of the verdict, plus $50,000 attorney fees. From this judgment defendants appeal.

Defendant Joseph E. Seagram & Sons, Inc., generally referred to as Seagram, Indiana, is an Indiana corporation and is a wholly owned subsidiary of Distillers Corporation Seagrams Ltd. of Canada (the latter not a party to this suit). Defendants Seagram-Distillers Corporation, a Delaware corporation, usually referred to as Seagram, Sales, and Calvert Distilling Company, a Maryland corporation, usually referred to as Calvert, are wholly owned subsidiaries of Joseph E. Seagram & Sons, Inc. Defendant Calvert Distillers Corporation is a Maryland corporation, usually referred to as Calvert, Sales, and is a wholly owned subsidiary of Calvert Distilling Company. Seagram, Indiana and Calvert are engaged in the manufacture of distilled spirits, and Seagram, Sales and Calvert, Sales, in the sale and distribution of the liquor manufactured by their respective parent corporations. The sales and distributions thus made by the defendants extended throughout the United States, including the State of Indiana. While Calvert prior to 1945 had been a wholly owned subsidiary of Distillers Corporation Seagram Ltd., the latter corporation on April 9, 1945 transferred all its stock in Calvert to Seagram, Indiana. Thus, from that time on both Calvert and Seagram, Sales were wholly owned subsidiaries of Seagram, Indiana, and Calvert, Sales was a wholly owned subsidiary of Calvert.

Plaintiff is a wholesale drug concern which has long been engaged in the wholesale liquor business in the State of Indiana. Beginning in February 1934, it became a distributor for Seagram products and as such wholesaler extensively sold and supplied those authorized to retail liquor in that State. Plaintiff was not at any time a distributor of Calvert products, but in the latter part of 1946 accepted an offer by Calvert to become its distributor, with a commitment from Calvert to supply an agreed quantity of liquor.

Plaintiff in its brief states: "The gravamen of plaintiff's claim, as submitted to the jury, was that as a proximate result of a conspiracy between the defendants to fix the resale price of their products, plaintiff, a liquor wholesaler, had lost the Seagram and Calvert lines of whiskies and other products, with consequent large damage to its business." To this might be added that the theory embodied in the complaint as well as that upon which the case was tried was that the defendants entered into a price fixing conspiracy illegal per se.

It may be noted that the complaint was premised in part upon the alleged unlawful acquisition by Seagram, Indiana of the common stock of Calvert on April 9, 1945. It is alleged: "By reason of such unlawful stock acquisition, the independent management, sales organization and sales policy, which, as aforesaid, prompted Calvert and Calvert (Sales) to expand their Indiana market in competition with defendants Seagram (Indiana) and Seagram (Sales) and to appoint plaintiff as a Calvert distributor and to contact and agree to supply Calvert products to plaintiff in competition with the products of Seagram (Indiana) and Seagram (Sales), became subject to the influence of the executive officers of Seagram (Indiana), who, by such acquisition had gained control over the Boards of Directors and over the outstanding securities of Calvert and Calvert (Sales)."

There being no proof, however, that competition between Seagram and Calvert was

affected by reason of the former's acquisition of the latter's stock, the cause of action predicated thereon has been abandoned by the plaintiff and reliance is placed solely upon a violation of Sec. 1.

We are confronted with numerous contested issues which in the main may be stated thus:

1. That the trial court erred in refusing to direct a verdict for the defendants and in refusing to enter a judgment notwithstanding the verdict on two grounds, viz.,

(a) That the evidence was insufficient to take the case to a jury on the allegation that a "contract, combination * * * or conspiracy" existed between the defendants in violation of Sec. 1 of the Sherman Act;

(b) That under the uncontradicted evidence the activities of the defendants even if in concert were not in restraint of trade and therefore not violative of Sec. 1 of the Sherman Act.

2. That the trial court erred in refusing to instruct the jury that no violation of Sec. 7 of the Clayton Act had been shown.

3. That the trial court erred in instructing the jury that it would constitute "no defense to this action, even though the plaintiff and the other wholesalers entered into a conspiracy among themselves."

There are numerous other errors assigned relative to the claimed erroneous admission and exclusion of evidence which, in the view we take of the case, need not be stated.

Plaintiff insists that there was adequate proof to present an issue for the jury as to whether defendants engaged in a conspiracy to fix the price at which their products were to be sold by the wholesale liquor dealers of Indiana, including plaintiff. On the other hand, defendants insist that there was no proof of such conspiracy but that the proof conclusively demonstrates that they pursued an independent course. We approach an appraisement of the proof with a full realization that it must be considered in a light most favorable to the plaintiff, and that the plaintiff is entitled to all reasonable inferences which may be deduced therefrom. With this thought in mind, we shall discuss the facts as they appear in plaintiff's brief, which we assume are as favorable to it as the record will justify.

During the period of O.P.A., liquor wholesalers were permitted to sell whiskies at 15% above cost but they were not permitted to include in such costs taxes imposed by the Federal or State governments. Thus, during this period of governmental regulation the profit of wholesalers was reduced to approximately 10% of the selling price. On October 23, 1946, O.P.A., regulations of liquor prices terminated. Prior thereto, plaintiff had decided upon such termination to apply its current 15% mark-up to its over-all costs, including Federal and State taxes. On October 31, 1946, a meeting was held of the Indiana Wholesale Liquor Dealers Association, attended by the plaintiff. Price changes made possible by the termination of O.P.A. were discussed. Immediately following this meeting a majority of the Indiana wholesalers, including plaintiff, filed with the Indiana Alcoholic Beverage Commission identical schedules of increased prices on spirits, wines and cordials.

Victor A. Fischel, vice president of Seagram, Sales, shortly prior to the expiration of the O.P.A. price regulation (October 23, 1946), determined upon a policy with reference to the prices to be charged for Seagram's products in the event of the termination of O.P.A., and on November 6, 1946 sent a telegram to all wholesalers in the United States as follows: "Despite the higher costs of production and of doing business generally, Seagram has decided to maintain former OPA prices on all brands. This decision was reached because of our sincere belief that it is not in our nor the public's interest to raise whiskey prices. By holding the price line we can win the fullest measure of public appreciation and confidence in our industry. Because the entire industry, distillers, wholesalers and retailers alike have enjoyed their most successful period in the last few years, we do not hesitate to request your support of this policy of holding the price line. We further request that you ask your retailers, both package store and on premise outlets not to increase prices either by the drink or by the

bottle. May we have immediate assurance of your full cooperation and information on the steps you are taking to this end."

On or about the same date this telegram was dispatched, Seagram suspended shipments to all Indiania wholesalers, including the plaintiff, because of their refusal to subscribe to the policy which Seagram had announced. On February 3, 1947, the wholesalers of Indiana, with the exception of plaintiff, filed notification with the Indiana Commission of their return to the O.P.A. method of the application of the existing 15% mark-up to only a part of the wholesaler's cost. Plaintiff refused to return to the old method and to subscribe to the policy announced by Seagram, and shipments to it were never resumed.

We now turn to the facts concerning Calvert, as shown by plaintiff's brief. Beginning in 1942, Calvert attempted on several occasions to obtain the facilities of plaintiff as one of its Indiana distributors. These overtures by Calvert culminated in October 1946 in an offer by Calvert to plaintiff of a distributorship, accompanied by the promise shortly thereafter of a sufficient amount of merchandise (two to three thousand cases per month) to interest plaintiff in taking on the Calvert line. At meetings in Indianapolis on November 5 and November 12, 1946, Calvert promised to supply plaintiff from two to three thousand cases of its product per month, made allocation of two thousand cases each for November and December 1946, and received from plaintiff Indiana revenue stamps covering these allotments. At the meeting between plaintiff and Calvert on November 5, 1946, Calvert's central division manager, Schwalb, brought up the subject of plaintiff's increased price change on its products and said it would have no effect on Calvert's shipment, that Calvert wanted to get into the market and this was a "swell opportunity." On November 12, 1946, a large sales meeting for launching the Calvert line with plaintiff was planned for November 23. At the meeting on November 12, Seagram's

price policy was discussed (no Seagram official was present) and the State manager for Calvert said that it still wanted to go along with plaintiff as a distributor. Gollin, assistant general sales manager of Calvert in New York, then stated by telephone to plaintiff's representative that the Seagram situation was going to make no difference, that he was going to guarantee personally that the merchandise would be delivered and for plaintiff to go ahead and make arrangements for the sales meeting.

Thereafter, on November 19, 1946, Moxley, plaintiff's president, received a telephone call from Schwalb at Chicago, saying that Calvert was not going to be able to ship the Calvert products that had been engaged to plaintiff, that Calvert was going along with Seagram on the latter's sales policy, that Calvert was terribly sorry but "had to go along with Seagram." Moxley immediately called Resnik, Calvert's general sales manager, at his New York office, reporting his telephone conversation with Schwalb. Resnik said that he was terribly sorry but that Calvert would have to withdraw from the arrangement. Upon being pressed for a reason, he said "he had to go along with the other side of the house." (These statements were denied by Calvert's officials but for the present purpose must be accepted as having been made.) Thereupon, Calvert struck plaintiff from its list of authorized distributors and refused to make any shipments.

Commencing about July 1, 1947, both Seagram and Calvert entered into fair trade contracts with all of their Indiana wholesalers except plaintiff, which contained provisions and price postings whereby the O.P.A. prices were prescribed as the minimum prices at which their goods could be sold by their Indiana wholesalers. (There is no contention that these agreements were illegal and we discern no connection between them and the conspiracy alleged.)

The above statement includes all the proof introduced at the trial[1] to show a con-

1. Plaintiff also relies upon the answers to certain interrogatories made by the officials of Seagram and Calvert, and upon certain contradictory statements as- serted to have been made by defendants' witnesses on cross-examination. These matters will be subsequently referred to.

spiracy or combination between Seagram and Calvert to fix the resale price which wholesalers were to charge for their products, as well as the means of forcing adherence to such resale prices—that is, by the cancellation of their distributorships upon such refusal.

We are wholly unable to discern how this testimony relied upon by plaintiff proves or tends to prove, by inference or otherwise, that Seagram and Calvert acted in concert or combination. On the other hand, it strongly indicates that each formulated its own policy and pursued an independent course. Seagram formulated its policy prior to the expiration of O.P.A. (October 23, 1946) and publicly proclaimed such policy to all wholesale liquor dealers by its telegram of November 6. That such policy was formulated and proclaimed by Seagram without any agreement or connivance with Calvert is hardly open to question, and the proof shows that during this time and up to November 19, 1946, Calvert was pursuing its own independent course, which was directly opposite to that which had been announced by Seagram. The proof in this respect is consistent with the complaint, which alleges: "At or about the same time that defendants Seagram (Indiana) and Seagram (Sales) were advising Indiana whisky distributors of their aforesaid policy with respect to the maintenance of existing wholesale prices, the sales organizations of defendants Calvert and Calvert (Sales) advised plaintiff that said Calvert companies did not intend to interfere with the resale prices charged by wholesalers for Calvert's products; that Calvert would continue to ship to the Indiana market, and that any altercation between said Seagram Companies and their Indiana wholesalers would afford said Calvert Companies an opportunity to increase substantially their Indiana market, of which opportunity they intended to take advantage." Thus, both the proof and the allegations of the complaint demonstrate that while Seagram was refusing to sell to those who failed to subscribe to its announced policy, Calvert had awarded plaintiff a distributorship and was preparing and

promising to make delivery to plaintiff on the latter's terms, and this irrespective of the policy which had been announced by Seagram. And it is significant that Seagram continued without any deviation to adhere to the policy which it originally announced.

It is true that Calvert subsequently abandoned its policy, repudiated its promise to make delivery to plaintiff and stated in effect that it would follow the policy which had formerly been announced and put into effect by Seagram. Great stress is laid upon statements by Calvert made on November 19, "We are going along with Seagram on their sales policy. We are terribly sorry but we have to go along with Seagram," and "he had to go along with the other side of the house." These statements were made by agents or officers of Calvert out of the presence and, so far as the record discloses, without the knowledge or approval of Seagram or any of its officials. Such statements were not binding upon Seagram and, of course, are no proof that it was or became a party to a conspiracy or combination. While the acts and statements of the members of a conspiracy are admissible and binding against all, we know of no rule which permits the statements of an alleged member to be utilized both to prove the conspiracy and at the same time to bind its members. And the argument that the sudden shift in Calvert's announced policy to coincide with that formerly announced and put into practice by Seagram gives rise to an inference of conspiracy is also without merit. The act of Calvert in changing its announced policy was no more binding on Seagram than the statements made by Calvert's officers as their excuse for changing its policy and repudiating its promise to plaintiff. The significant point is that Seagram at that time made no change but continued the same policy which it had independently announced and put into practice. The most the proof shows is that Calvert for reasons of its own decided to abandon its policy and to follow that in practice by its competitor. There is not a scintilla of proof that this shift in the position of Calvert was at the request, invitation, demand

or suggestion of Seagram. This action on the part of Calvert does not prove or tend to prove that it was done by agreement with Seagram any more than proof that a hound is chasing a fox is evidence that the chase is by agreement with the fox.

The testimony which we have so far discussed is that offered by the plaintiff at the trial to prove a conspiracy. There are some additional matters, however, shown by the record and urged by the plaintiff in support of its contention that a conspiracy was proven. Of such additional matters, the most important perhaps are the answers to certain interrogatories propounded by plaintiff to officials of both Seagram and Calvert prior to and admitted at the trial. To Friel, a Seagram official, there was propounded the following interrogatory: "State whether, between November 6, 1946 and February 3, 1947, any officer or employee of Seagram (Sales) communicated to, or conferred with, any officer of Calvert or Calvert (Sales) with reference to the delivery or non-delivery of Calvert products to Kiefer-Stewart Company." His answer to such interrogatory was "Yes." He was then requested to state "the names of persons so conferring or sending or receiving such communications and the date or dates of such conferences or communications." He answered as follows: "The names of the persons so conferring were: Victor Fischel, W. W. Wachtel, Frank Schwengel, Tubie Resnick and possibly others whose names are unknown to defendant. Defendant is unable to give any specific dates of any such conferences or communications." A similar interrogatory propounded to an official of Calvert was also answered in the affirmative, and substantially the same persons named as being those "conferring or sending or receiving such communications" and also that Calvert "was unable to give any specific dates of any of such conferences or communications."

How the answers to these questions furnish any support to the conspiracy charged is not discernible. It is true the answers disclose that conferences were held between the officials of Seagram and Calvert "with reference to the delivery or non-delivery of Calvert products to Kiefer-Stewart Company" sometime between November 6, 1946 and February 3, 1947. Even so, the information thus obtained is so indefinite and uncertain both as to the time and subject matter as to strip it of all probative value. If such a conference took place early in November or about the time Calvert changed its position, some connection might be inferred. On the other hand, if the conference did not take place until February of the following year, it could hardly be inferred that there was any connection between such a conference and Calvert's change of position which had taken place some three months previously. And the subject matter of information thus obtained is also of such an uncertain and indefinite nature as to carry no weight.

The fact that they conferred proves nothing more than an opportunity to reach an understanding or to make an agreement. An inference that they did so can be nothing more than a guess. Especially is this so in view of the uncertainty as to when the conference took place relative to the time the alleged agreement must have been made. Even though the conference had to do with "the delivery or non-delivery of Calvert products to Kiefer-Stewart Company," many matters might have been considered other than the agreement alleged, and we note one plausible reason for a conference —that was the predicament with which the defendants were faced by reason of the action of the plaintiff and other wholesalers in ostensibly announcing a policy by which they would all sell to the retailers at a fixed price. In fact, defendants pleaded this situation as a defense and it was assigned by them as a reason, particularly by Seagram, for their refusal to supply the wholesalers with liquor. That they had a concrete reason for being concerned is shown by the fact that some of the instant defendants had been convicted and penalized in a criminal prosecution under circumstances much akin to those of the instant situation. See United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951. If they had sold to the wholesalers with knowledge that the latter were en-

gaged in a price-fixing conspiracy of their own, defendants might have found themselves impaled on one prong of a two-horned dilemma. By refusing to sell under such circumstances, they now find themselves impaled on the other horn. Therefore, if a guess is to be made as to the purpose of the conference, we think the situation thus disclosed affords a more reasonable basis for the same.

Plaintiff also relies upon certain alleged inconsistent and false answers made by defendants' witnesses on cross-examination. The most important item referred to in this phase of the argument is that Fischel, vice president of Seagram, Sales, stated on cross-examination that he "did not discuss with them (Calvert) at all" the matter of delivery of whisky to wholesalers in Indiana. He denied that he was present at any conference between officials of the two companies, although he was one of those named by Friel of Seagram in response to an interrogatory as above shown. Subsequently Fischel was recalled to the stand and attempted to explain his testimony by stating that what he intended to say was that he had had no conversation with Calvert officials prior to November 6. As we have already shown, the answers to the interrogatories prove nothing insofar as they relate to the conspiracy charged, and we think it evident that its probative value could not be enhanced by Fischel whether he affirmed or denied it. Wachtel, president of Calvert Distillers Corporation, who was also named as being present by Friel in response to the interrogatory, denied that any conferences were held "before the act," but admitted that he had "exchanged information with Seagram" "after the act." We see no contradiction between this testimony and Friel's answer to the interrogatory. As already noted, the answer to the interrogatory fixed no date for the conference other than that it took place between November 6, 1946 and February 3, 1947. Other discrepancies referred to relate to certain minor contradictions between the testimony of different officials of Calvert and likewise furnish no proof of the conspiracy charged.

In our view, the evidence fails to show that the defendants acted in concert or as a result of conspiracy. On the other hand, it strongly indicates that Seagram and Calvert formulated and pursued their own independent courses. That such was the case in the beginning is hardly open to doubt, and the fact that these courses at some time along the road took a similar pattern is not proof, in our judgment, that such similarity was the result of a conspiracy.

Assuming, however, contrary to what we hold, that the proof was sufficient to show that the defendants acted in concert, we think there is another obstacle fatal to plaintiff's right to prevail. The complaint alleged that the defendants conspired "unlawfully to agree upon and fix the resale prices of said defendants' respective whiskies sold to wholesalers in Indiana and unlawfully to cut off and cease all shipments of their respective whiskies both in interstate and intrastate commerce to such of the Indiana wholesalers as did not agree to abide by the resale prices so fixed and agreed upon by the said defendants." Thus, a price fixing agreement was alleged and it was upon this theory that the case was tried, submitted to the jury, and upon the same theory the judgment is now sought to be affirmed. Plaintiff in its brief states, "The issue of fact is whether Seagram and Calvert concertedly determined to fix the resale price of their products."

Was the agreement which we assume to have been shown that which was alleged and which plaintiff now asserts is the issue on this appeal? We think it was not. The agreement shown was that embodied solely in the policy announced by Seagram. No policy was ever announced by Calvert other than that it would follow the Seagram policy. The latter's policy as well as the reason therefor is clearly and unmistakably shown by Seagram's telegram (heretofore quoted) sent to wholesale liquor dealers, dated November 6, 1946. That policy was "to maintain former OPA prices on all brands," with the request that the wholesalers support "this policy of holding the price line" and that they request the retail-

ers "not to increase prices either by the drink or by the bottle." Thus this announced policy, together with the refusal on the part of defendants to supply liquor to wholesalers who refused to recognize such policy, embraces every element of the conspiracy, agreement or concerted activity claimed to have been proven.

■ There is, in our opinion, a wide and fatal gap between the agreement relied upon and that shown. The defendants, as the O.P.A. had previously done, announced a maximum price policy above which their products could not be resold. This was the sole restriction which they sought to place upon the wholesalers who were all accorded the same treatment. No discrimination in this respect was directed at the plaintiff or any other wholesaler. The defendants fixed no price at which their products could or must be resold. The wholesaler was free to fix any price which it saw fit within the maximum limitation. There was no impairment upon their ability to meet a competitor's price or to sell for less. Neither were they required to sell Seagram and Calvert products at the same price.

■■ Price fixing combinations violate the Sherman Act per se because they tend to eliminate competition. United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 296, 65 S.Ct. 661, 89 L.Ed. 951. The Sherman Act is intended to prevent unreasonable restraint of commerce. United States v. Bausch & Lomb Optical Co. et al., 321 U.S. 707, 728, 64 S.Ct. 805, 88 L.Ed. 1024. In our view, the restriction imposed by the defendants was neither in restraint of trade nor an impairment of competition. Competition, so we think, does not rest upon the ability to charge a higher price than a competitor but upon the ability to meet the price or undersell that fixed by a competitor. Bona fide competition results in benefit to the consumer in the form of lower prices. Higher prices are a detriment to the consumer and are no aid to the competitive system. The ability to sell at a lower price likewise increases the volume of goods which the consumer is likely to buy, and it is a stimulant to trade and not a hindrance. Trade, like competition, is impaired by high prices and the ability to increase prices. It is, therefore, our view that the restriction which defendants sought to place upon the wholesalers constituted no restraint on trade and no interference with plaintiff's right to engage in all the competition it desired.

That the difference between the agreement alleged and that shown is material is emphasized by plaintiff's effort to sustain the refusal of the court to instruct the jury, as requested by the defendants, that "the action of the defendants * * * directed solely towards preventing an increase in the resale prices of their products * * * was not a violation of the anti-trust laws * * *." Plaintiff argues that defendants were not entitled to this instruction because the court's instruction "clearly required the jury to determine whether or not defendants conspired to fix their resale prices," and further the plaintiff states, "The jury was not told that it could find a conspiracy to fix from the setting of a price above which defendants' products could not be sold, but it was instructed that it must find a conspiracy between defendants to fix the resale price of their products." And plaintiff's argument continues, "Therefore, the question whether a conspiracy to place a ceiling on resale prices is *illegal per se,* posed by defendants, does not arise under the court's instructions and becomes material only if there was not sufficient evidence to sustain the jury's finding under the court's instruction, as given, that defendants conspired to *fix the prices* which their customers should charge."

This argument demonstrates the fallacious premise upon which plaintiff's judgment was obtained. It recognizes the distinction between an agreement to prevent an increase in the resale price of defendants' products and an agreement to fix their resale price. It was upon the latter theory that the judgment was obtained but, as we have shown, there is not a scintilla of proof of such an agreement, and if any agreement was shown it was one to prevent an increase in the resale price.

Plaintiff, however, makes the point that even an agreement to prevent an increase

in the resale price was banned by the Supreme Court in United States v. Socony-Vacuum Oil Co., Inc. et al., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. It is true the court used some strong and exclusive language with reference to any agreement which tampers with the price structure, but the language used must be considered in connection with the facts before the court, which the court viewed as showing combinations and agreements to raise the price and of then pegging or stabilizing the same. As the court stated, 310 U.S. at page 223, 60 S.Ct. at page 844, 84 L.Ed. 1129, "In this case, the result was to place a floor under the market—a floor which served the function of increasing the stability and firmness of market prices. That was repeatedly characterized in this case as stabilization." Neither in that case, however, nor in any other case of which we are aware has the Supreme Court held illegal per se an agreement to prevent a raise of prices of manufacturer's or producer's products in the hands of a distributor.

The language of the court in the Socony-Vacuum case upon which plaintiff particularly relies is that 310 U.S. at page 222, 60 S.Ct. at page 844, 84 L.Ed. 1129, "An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used." And further 310 U.S. at page 223, 60 S.Ct. at page 844, 84 L.Ed. 1129, "* * * a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." In our view, none of these interdictions are applicable to the instant situation. The agreement shown did not purport to require rigid or uniform prices on the part of the wholesalers or that they raise or lower prices, and neither was it for the purpose and effect of raising, depressing, fixing, pegging or stabilizing such prices.

In view of what we have said, it becomes unnecessary to discuss or consider other issues raised by the defendants. The judg-ment is reversed and the cause remanded, with directions that the judgment be vacated and the cause of action dismissed at plaintiff's cost.