## ALBRECHT *v.* HERALD CO., DBA GLOBE-DEMOCRAT PUBLISHING CO.

No. 43.   Argued November 9, 1967.—Decided March 4, 1968.

146

*Gray L. Dorsey* argued the cause for petitioner. With him on the briefs was *Donald S. Siegel.*

*Lon Hocker* argued the cause for respondent. With him on the brief was *Thomas Newman.*

*Arthur B. Hanson* filed a brief for the American Newspaper Publishers Association, as *amicus curiae,* urging affirmance.

MR. JUSTICE WHITE delivered the opinion of the Court.

A jury returned a verdict for respondent in petitioner's suit for treble damages for violation of § 1 of the Sherman Act.[1] Judgment was entered on the verdict and the Court of Appeals for the Eighth Circuit affirmed. 367 F. 2d 517 (1966). The question is whether the denial of petitioner's motion for judgment notwithstanding the verdict was correctly affirmed by the Court of Appeals. Because this case presents important issues under the antitrust laws, we granted certiorari. 386 U. S. 941 (1967).

---

[1] Section 1 of the Sherman Act, 26 Stat. 209, 15 U. S. C. § 1, in part provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

We take the facts from those stated by the Court of Appeals. Respondent publishes the Globe-Democrat, a morning newspaper distributed in the St. Louis metropolitan area by independent carriers who buy papers at wholesale and sell them at retail. There are 172 home delivery routes. Respondent advertises a suggested retail price in its newspaper. Carriers have exclusive territories which are subject to termination if prices exceed the suggested maximum. Petitioner, who had Route 99, adhered to the advertised price for some time but in 1961 raised the price to customers.[2] After more than once objecting to this practice, respondent wrote petitioner on May 20, 1964, that because he was overcharging and because respondent had reserved the right to compete should that happen, subscribers on Route 99 were being informed by letter that respondent would itself deliver the paper to those who wanted it at the lower price. In addition to sending these letters to petitioner's customers, respondent hired Milne Circulation Sales, Inc., which solicited readers for newspapers, to engage in telephone and house-to-house solicitation of all residents on Route 99. As a result, about 300 of petitioner's 1,200 customers switched to direct delivery by respondent. Meanwhile, respondent continued to sell papers to petitioner but warned him that should he continue to overcharge, respondent would not have to do business with him. Since respondent did not itself want to engage in home delivery, it advertised a new route of 314 customers as available without cost. Another carrier, George Kroner, took over the route knowing that respondent would not tolerate overcharging and understanding that he might have to return the

---

[2] The record indicates that petitioner raised his price by 10 cents a month.

route if petitioner discontinued his pricing practice.[3]  On July 27 respondent told petitioner that it was not interested in being in the carrier business and that petitioner could have his customers back as long as he charged the suggested price.  Petitioner brought this lawsuit on August 12.  In response, petitioner's appointment as a carrier was terminated and petitioner was given 60 days to arrange the sale of his route to a satisfactory replacement.  Petitioner sold his route for $12,000, $1,000 more than he had paid for it but less than he could have gotten had he been able to turn over 1,200 customers instead of 900.[4]

Petitioner's complaint charged a combination or conspiracy in restraint of trade under § 1 of the Sherman Act.[5]  At the close of the evidence the complaint was amended to charge only a combination between respondent and "plaintiff's customers and/or Milne Circulation Sales, Inc. and/or George Kroner."  The case went to the jury on this theory, the jury found for respondent, and judgment in its favor was entered on the verdict. The court denied petitioner's motion for judgment notwithstanding the verdict, which asserted that under *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960), and like cases, the undisputed facts showed as a matter of law a combination to fix resale prices of newspapers which was *per se* illegal under the Sherman Act.  The Court of Appeals affirmed.  In its view "the

---

[3] The record shows that at about this time petitioner lowered his price to respondent's advertised price.  Although petitioner notified all his customers of this change, respondent apparently remained unaware of it.

[4] Kroner testified at trial that he sold the customers he had within Route 99 to petitioner's vendee for $3,600.

[5] Petitioner also charged respondent with tortious interference with business relations under state law, but this count was dismissed before trial.

undisputed evidence fail[ed] to show a Sherman Act violation," because respondent's conduct was wholly unilateral and there was no restraint of trade. The previous decisions of this Court were deemed inapposite to a situation in which a seller establishes maximum prices to be charged by a retailer enjoying an exclusive territory and in which the seller, who would be entitled to refuse to deal, simply engages in competition with the offending retailer. We disagree with the Court of Appeals and reverse its judgment.

On the undisputed facts recited by the Court of Appeals respondent's conduct cannot be deemed wholly unilateral and beyond the reach of § 1 of the Sherman Act. That section covers combinations in addition to contracts and conspiracies, express or implied. The Court made this quite clear in *United States* v. *Parke, Davis & Co.,* 362 U. S. 29 (1960), where it held that an illegal combination to fix prices results if a seller suggests resale prices and secures compliance by means in addition to the "mere announcement of his policy and the simple refusal to deal . . . ." *Id.,* at 44. Parke Davis had specified resale prices for both wholesalers and retailers and had required wholesalers to refuse to deal with noncomplying retailers. It was found to have created a combination "with the retailers and the wholesalers to maintain retail prices . . . ." *Id.,* at 45. The combination with retailers arose because their acquiescence in the suggested prices was secured by threats of termination; the combination with wholesalers arose because they cooperated in terminating price-cutting retailers.

If a combination arose when Parke Davis threatened its wholesalers with termination unless they put pressure on their retail customers, then there can be no doubt that a combination arose between respondent, Milne, and Kroner to force petitioner to conform to the advertised retail price. When respondent learned that

petitioner was overcharging, it hired Milne to solicit customers away from petitioner in order to get petitioner to reduce his price. It was through the efforts of Milne, as well as because of respondent's letter to petitioner's customers, that about 300 customers were obtained for Kroner. Milne's purpose was undoubtedly to earn its fee, but it was aware that the aim of the solicitation campaign was to force petitioner to lower his price. Kroner knew that respondent was giving him the customer list as part of a program to get petitioner to conform to the advertised price, and he knew that he might have to return the customers if petitioner ultimately complied with respondent's demands. He undertook to deliver papers at the suggested price and materially aided in the accomplishment of respondent's plan. Given the uncontradicted facts recited by the Court of Appeals, there was a combination within the meaning of § 1 between respondent, Milne, and Kroner, and the Court of Appeals erred in holding to the contrary.[6]

---

[6] Petitioner's original complaint broadly asserted an illegal combination under § 1 of the Sherman Act. Under *Parke, Davis* petitioner could have claimed a combination between respondent and himself, at least as of the day he unwillingly complied with respondent's advertised price. Likewise, he might successfully have claimed that respondent had combined with other carriers because the firmly enforced price policy applied to all carriers, most of whom acquiesced in it. See *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365, 372 (1967). These additional claims, however, appear to have been abandoned by petitioner when he amended his complaint in the trial court.

Petitioner's amended complaint did allege a combination between respondent and petitioner's customers. Because of our disposition of this case it is unnecessary to pass on this claim. It was not, however, a frivolous contention. See *Federal Trade Commission* v. *Beech-Nut Packing Co.,* 257 U. S. 441 (1922); *Girardi* v. *Gates Rubber Co. Sales Div., Inc.,* 325 F. 2d 196 (C. A. 9th Cir. 1963); *Graham* v. *Triangle Publications, Inc.,* 233 F. Supp. 825 (D. C. E. D. Pa. 1964), aff'd *per curiam,* 344 F. 2d 775 (C. A. 3d Cir. 1965).

The Court of Appeals also held there was no restraint of trade, despite the long-accepted rule in § 1 cases that resale price fixing is a *per se* violation of the law whether done by agreement or combination.[7]   *United States* v.

---

[7] Our Brother HARLAN seems to state that suppliers have no interest in programs of minimum resale price maintenance, and hence that such programs are "essentially" horizontal agreements between dealers even when they appear to be imposed unilaterally and individually by a supplier on each of his dealers.  Although the empirical basis for determining whether or not manufacturers benefit from minimum resale price programs appears to be inconclusive, it seems beyond dispute that a substantial number of manufacturers formulate and enforce complicated plans to maintain resale prices because they deem them advantageous.  See E. Grether, Price Control Under Fair Trade Legislation, c. X (1939); Federal Trade Commission, Report on Resale Price Maintenance 5–11, 59 (1945); Select Committee on Small Business, Fair Trade: The Problem and the Issues, H. R. Rep. No. 1292, 82d Cong., 2d Sess. (1952); Bowman, The Prerequisites and Effects of Resale Price Maintenance, 22 U. Chi. L. Rev. 825, 832–843 (1955); Corey, Fair Trade Pricing: A Reappraisal, 30 Harv. Bus. Rev. No. 5, p. 47 (1952); Fulda, Resale Price Maintenance, 21 U. Chi. L. Rev. 175, 184–186 (1954).  As a theoretical matter, it is not difficult to conceive of situations in which manufacturers would rightly regard minimum resale price maintenance to be in their interest.  Maintaining minimum resale prices would benefit manufacturers when the total demand for their product would not be increased as much by the lower prices brought about by dealer competition as by some other nonprice, demand-creating activity.  In particular, when total consumer demand (at least within that price range marked at the bottom by the minimum cost of manufacture and distribution and at the top by the highest price at which a price maintenance scheme can operate effectively) is affected less by price than by the number of retail outlets for the product, the availability of dealer services, or the impact of advertising and promotion, it will be in the interest of manufacturers to squelch price competition through a scheme of resale price maintenance in order to concentrate on nonprice competition.  Finally, if the retail price of each of a group of competing products is stabilized through manufacturer-imposed price maintenance schemes, the danger to all the manufacturers of severe interbrand price competition is apt to be alleviated.

*Trenton Potteries Co.,* 273 U. S. 392 (1927); *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940); *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211 (1951); *United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305 (1956).

In *Kiefer-Stewart, supra,* liquor distributors combined to set maximum resale prices. The Court of Appeals held the combination legal under the Sherman Act because in its view setting maximum prices ". . . constituted no restraint on trade and no interference with plaintiff's right to engage in all the competition it desired." 182 F. 2d 228, 235 (C. A. 7th Cir. 1950). This Court rejected that view and reversed the Court of Appeals, holding that agreements to fix maximum prices "no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." [8] 340 U. S. 211, 213.

We think *Kiefer-Stewart* was correctly decided and we adhere to it. Maximum and minimum price fixing may have different consequences in many situations. But schemes to fix maximum prices, by substituting the perhaps erroneous judgment of a seller for the forces of the competitive market, may severely intrude upon the ability of buyers to compete and survive in that market. Competition, even in a single product, is not cast in a single mold. Maximum prices may be fixed too low for

---

[8] Our Brother HARLAN appears to read *Kiefer-Stewart* as prohibiting only combinations of suppliers to squeeze retailers from the top. Under this view, scarcely derivable from the opinion in that case, signed contracts between a single supplier and his many dealers to fix maximum resale prices would not violate the Sherman Act. With all deference, we reject this view, which seems to stem from the notion that there can be no agreement violative of § 1 unless that agreement accrues to the benefit of both parties, as determined in accordance with some *a priori* economic model. Cf. Comment, The Per Se Illegality of Price-Fixing—Sans Power, Purpose, or Effect, 19 U. Chi. L. Rev. 837 (1952).

the dealer to furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay. Maximum price fixing may channel distribution through a few large or specifically advantaged dealers who otherwise would be subject to significant nonprice competition. Moreover, if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual cost of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices.[9] It is our view, therefore, that the combination formed by the respondent in this case to force petitioner to maintain a specified price for the resale of the newspapers which he had purchased from respondent constituted, without more, an illegal restraint of trade under § 1 of the Sherman Act.

We also reject the suggestion of the Court of Appeals that *Kiefer-Stewart* is inapposite and that maximum price fixing is permissible in this case. The Court of Appeals reasoned that since respondent granted exclusive territories, a price ceiling was necessary to protect the public from price gouging by dealers who had monopoly power in their own territories. But neither the existence of exclusive territories nor the economic power they might place in the hands of the dealers was at issue before the jury. Likewise, the evidence taken was not directed to the question of whether exclusive territories had been granted or imposed as the result of an illegal combination in violation of the antitrust laws. Certainly on the record before us the Court of Appeals was not entitled to assume, as its reasoning necessarily did, that the

---

[9] In *Kiefer-Stewart* after the manufacturer established the maximum price at which its product could be sold, it fair-traded the product so as to fix that price as the legally permissible minimum. 182 F. 2d, at 230–231.

exclusive rights granted by respondent were valid under § 1 of the Sherman Act, either alone or in conjunction with a price-fixing scheme. See *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365, 373, 379 (1967). The assertion that illegal price fixing is justified because it blunts the pernicious consequences of another distribution practice is unpersuasive. If, as the Court of Appeals, said, the economic impact of territorial exclusivity was such that the public could be protected only by otherwise illegal price fixing itself injurious to the public, the entire scheme must fall under § 1 of the Sherman Act.

In sum, the evidence cited by the Court of Appeals makes it clear that a combination in restraint of trade existed. Accordingly, it was error to affirm the judgment of the District Court which denied petitioner's motion for judgment notwithstanding the verdict. The judgment of the Court of Appeals is reversed and the case is remanded to that court for further proceedings consistent with this opinion.                *Reversed and remanded.*

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, there is a word I would add. This is a "rule of reason" case stemming from *Standard Oil Co.* v. *United States*, 221 U. S. 1, 62. Whether an exclusive territorial franchise in a vertical arrangement is *per se* unreasonable under the antitrust laws is a much mooted question. A fixing of prices for resale is conspicuously unreasonable, because of the great leverage that price has over the market. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 221. The Court quite properly refuses to say whether in the newspaper distribution business an exclusive territorial franchise is illegal.

The traditional distributing agency is the neighborhood newspaper boy. Whether he would have the time, acu-

men, experience, or financial resources to wage competitive warfare without the protection of a territorial franchise is at least doubtful. Here, however, we have a distribution system which has the characteristics of a large retail enterprise. Petitioner's business requires practically full time. He purchased his route for $11,000, receiving a list of subscribers, a used truck, and a newspaper-tying machine. At the time his dispute with respondent arose, there were 1,200 subscribers on the route, and that route covered "the whole northeast section" of a "big city." Deliveries had to be made by motor vehicle and although they were usually completed by 6 o'clock in the morning, the rest of the workday was spent in billing, receiving phone calls, arranging for new service, or in placing "stop" or "start" orders on existing service. Petitioner at times hired a staff to tie and to wrap newspapers.

Under our decisions* the legality of exclusive territorial franchises in the newspaper distribution business

---

\* "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." *Chicago Board of Trade* v. *United States*, 246 U. S. 231, 238. Cf. *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (economics of the drug distribution business); *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365 (economics of the bicycle business). In the latter case we noted that the evidence of record "elaborately sets

would have to be tried as a factual issue; and that was not done here.

The case is therefore close to *White Motor Co.* v. *United States,* 372 U. S. 253, where before ruling on the legality of a territorial restriction in a vertical arrangement, we remanded for findings on "the actual impact of these arrangements on competition." *Id.,* at 263.

MR. JUSTICE HARLAN, dissenting.

While I entirely agree with the views expressed by my Brother STEWART and have joined his dissenting opinion, the Court's disregard of certain economic considerations underlying the Sherman Act warrants additional comment.

## I.

The practice of setting genuine price "ceilings," that is maximum prices, differs from the practice of fixing minimum prices, and no accumulation of pronouncements from the opinions of this Court can render the two economically equivalent.

The allegation of a combination of persons to fix maximum prices undoubtedly states a Sherman Act cause of action. In order for a plaintiff to win such a § 1 case, however, he must be able to prove the existence of the alleged combination, and the defendant must be unable, either by virtue of a *per se* rule or by failure of proof at trial, to show an adequate justification. It is on these two points that price ceilings differ from price floors: to hold that a combination may be inferred from the vertical dictation of a maximum price simply because it may be permissible to infer a combination from the vertical dictation of a minimum price ignores economic

forth information as to the total market interaction and interbrand competition, as well as the distribution program and practices." 388 U. S., at 367.

reality; to conclude that no acceptable justification for fixing maximum prices can be found simply because there is no acceptable justification for fixing minimum prices is to substitute blindness for analysis.

Resale price maintenance, a practice not involved here, lessens horizontal intrabrand competition. The effects, higher prices, less efficient use of resources, and an easier life for the resellers, are the same whether the price maintenance policy takes the form of a horizontal conspiracy among resellers or of vertical dictation by a manufacturer plus reseller acquiescence. This means two things. First, it is frequently possible to infer a combination of resellers behind what is presented to the world as a vertical and unilateral price policy, because it is the resellers and not the manufacturer who reap the direct benefits of the policy. Second, price floors are properly considered *per se* restraints, in the sense that once a combination to create them has been demonstrated, no proffered justification is an acceptable defense. Following the rule of reason, combinations to fix price floors are invariably unreasonable: to the extent that they achieve their objective, they act to the direct detriment of the public interest as viewed in the Sherman Act. In the absence of countervailing fair trade laws, all asserted justifications are, upon examination, found wanting, either because they are too trivial or elusive to warrant the expense of a trial (as is the case, for example, with a defense that price floors maintain the prestige of a product) or because they run counter to Sherman Act premises (as is the case with the defense that price maintenance enables inefficient sellers to stay in business).

Vertically imposed price ceilings are, as a matter of economic fact that this Court's words cannot change, an altogether different matter. Other things being equal, a manufacturer would like to restrict those distributing

his product to the lowest feasible profit margin, for in this way he achieves the lowest overall price to the public and the largest volume. When a manufacturer dictates a minimum resale price he is responding to the interest of his customers, who may treat his product better if they have a secure high margin of profits. When the same manufacturer dictates a price ceiling, however, he is acting directly in his own interest, and there is no room for the inference that he is merely a mechanism for accomplishing anticompetitive purposes of his customers.[1]

Furthermore, the restraint imposed by price ceilings is of a different order from that imposed by price floors. In the present case the Court uses again the fallacious argument that price ceilings and price floors must be equally unreasonable because both "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." [2] The fact of the matter is that this statement does not in itself justify a *per se* rule in either the maximum or minimum price case, and that the real justification for a *per se* rule in the case of minimums has not been shown to exist in the case of maximums.

It has long been recognized that one of the objectives of the Sherman Act was to preserve, for social rather than economic reasons, a high degree of independence, multiplicity, and variety in the economic system. Recognition of this objective does not, however, require this Court to hold that every commercial act that fetters the freedom of some trader is a proper subject for a *per se* rule in the sense that it has no adequate provable justification. See, *e. g.*, *White Motor Co.* v. *United States,*

---

[1] See the opinion of Judge Coffin in *Quinn* v. *Mobil Oil Co.*, 375 F. 2d 273, 276.

[2] *Kiefer-Stewart Co.* v. *Seagram & Sons*, 340 U. S. 211, 213.

372 U. S. 253. The *per se* treatment of price maintenance is justified because analysis alone, without the burden of a trial in each individual case, demonstrates that price floors are invariably harmful on balance.[3] Price ceilings are a different matter: they do not lessen horizontal competition; they drive prices toward the level that would be set by intense competition, and they cannot go below this level unless the manufacturer who dictates them and the customer who accepts them have both miscalculated. Since price ceilings reflect the manufacturer's view that there is insufficient competition to drive prices down to a competitive level, they have the arguable justification that they prevent retailers or wholesalers from reaping monopoly or supercompetitive profits.

When price floors and price ceilings are placed side by side, then, and the question is asked of each, "Does analysis justify a no-trial rule?" the answers must be quite different. Both practices share the negative attribute that they restrict individual discretion in the pricing area, but only the former imposes upon the public the much more significant evil of lessened competition, and, as just seen, the latter has an important arguable justification that the former does not possess. As the Court's opinion partially but inexplicitly recognizes, in a maximum price case the asserted justification must be met on its merits, and not by incantation of a *per se* rule developed for an altogether different situation.[4]

---

[3] See the analysis in the leading case, *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, at 395–402. Price floors, or other agreements to prevent price cutting, are there held to be *per se* unreasonable because they inevitably lessen competition. There is no reference to the purely collateral effect of limiting individual trader discretion, still less to a program such as the one involved in this case that does not inhibit competitive price cutting.

[4] The same points may be made from the perspective of the retailers or wholesalers subject to the price dictation. When the

## II.

The Court's discovery in this case of (a) a combination and (b) a restraint that is *per se* unreasonable is beset with pitfalls. The Court relies directly on combinations with Milne and Kroner, two third parties who were simply hired and paid to do telephoning and distributing jobs that respondent could as effectively have done itself. Neither had any special interest in respondent's objective of setting a price ceiling. If the critical question is whether a company pays one of its own employees to perform a routine task, or hires an outsider to do the same thing, the requirement of a "combination" in restraint of trade has lost all significant meaning. The point is more than that the words in a statute ought to be taken to mean something of substance. The premise of § 1 adjudication has always been that it is quite proper for a firm to set its own prices and determine its own territories, but that it may not do so

---

issue is minimum resale prices, those sellers who are more efficient and ambitious are likely to object to price restrictions, while the lazier and less efficient sellers will welcome their protection. When the issue is price ceilings, the matter is different. Assuming the ceilings are high enough to permit a return that will enable the seller to stay in business, a seller will object to price ceilings only because they deny him the supercompetitive return that the imperfections of competition would otherwise permit. At the same time, in stark contrast to the situation involved in resale price maintenance, no seller has any interest in insisting that price ceilings be imposed on his competitors; he is not worried that they may sell at a higher price than his own. Thus while resale price maintenance establishes what is the equivalent of a single horizontal restraint on otherwise competitive sellers, price ceilings establish merely a series of distinct vertical relationships between manufacturer and seller, with no one seller economically interested in the maintenance of the vertical relationship with any other seller.

in conjunction with another firm with which, in combination, it can generate market power that neither would otherwise have. A firm is not "combining" to fix its own prices or territory simply because it hires outside accountants, market analysts, advertisers by telephone or otherwise, or delivery boys. Once it is recognized that Kroner had no interest whatever in forcing his competitor to *lower* his price, and was merely being paid to perform a delivery job that respondent could have done itself, it is clear respondent's activity was in its essence unilateral.

The Court, quite evidently dissatisfied with the Milne and Kroner theories of combination, goes on to suggest two others not claimed. First, it is said, petitioner might have alleged a combination with other carriers who accepted respondent's maximum price. The difficulty with this thesis is that such a "combination" would have been wholly irrelevant to what was done to petitioner. In a price maintenance situation, each distributor does have an interest in preventing others from breaking the price line and driving everyone's prices down, and there is thus a real symphony of interests behind the pressure exerted on any individual retailer. However, in contrast, the effectiveness of a price ceiling imposed on one distributor does not depend upon the imposition of ceilings on other distributors, be they competitive or not. Each distributor's maximum price agreement is, for reasons already discussed, a vertical matter only, independent of agreements by other dealers. Hence the result of the Court's theory here would be to make what was done to this petitioner illegal because of the coincidental existence of unrelated similar agreements, and to base petitioner's right to recover upon activities that are altogether irrelevant to whatever harm he has suffered.

The Court also suggests that, under *Parke, Davis,* "petitioner could have claimed a combination between

respondent and himself, at least as of the day he unwillingly complied with respondent's advertised price." This theory is intriguing, because although it is unsound on its face, it has within it the ring of something familiar. Obviously it makes no sense to deny recovery to a pressured retailer who resists temptation to the last and grant it to one who momentarily yields but is restored to virtue by the vision of treble damages. It is not the momentary acquiescence but the punishment for refusing to acquiesce that does the damage on which recovery is based.

The Court's difficulties on all of its theories stem from its unwillingness to face the ultimate conclusion at which it has actually arrived: it is unlawful for one person to dictate price floors or price ceilings to another; any pressure brought to bear in support of such dictation renders the dictator liable to any dictatee who is damaged. The reason for the Court's reluctance to state this conclusion bluntly is transparent: this statement of the matter takes no account of the absence of a combination or conspiracy.

This does not mean, however, that no combination or conspiracy could ever be inferred in such an ostensibly unilateral situation. It would often be proper to infer, in situations in which a manufacturer dictates a minimum price to a retailer, that the manufacturer is the mechanism for enforcing a very real combinatorial restraint among retailers who should be competing horizontally.[5] Instead of undertaking to analyze when this

---

[5] See Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655. Professor Turner (as he then was) suggested the overruling of *United States* v. *Colgate & Co.*, 250 U. S. 300, arguing, *inter alia,* that *Colgate* behavior by a manufacturer tends to produce tacit or

inference would be proper, the Court has in the past followed the rough approximation adopted in *Parke, Davis:* [6] there is no "combination" when a manufacturer simply states a resale price and announces that he will not deal with those who depart from it; there is a combination when the manufacturer goes one inch further. The magical quality in this transformation is more apparent than real, for the underlying horizontal combination may frequently be there and the Court has simply failed to state what it is.[7]

When a manufacturer dictates a maximum price, however, the *Parke, Davis* approach does not yield even a satisfactory rough answer to the question "[I]s there a combination?" For the manufacturer who purports to act unilaterally in dictating a maximum price really is acting unilaterally. No one is economically interested in the price squeeze but himself. Had the Court been in the habit of analyzing the economics on which the inference of a combination may be based, it would have seen that

---

implied minimum price agreements among otherwise competitive retailers. He suggested that "it should be perfectly clear to any manufacturer that a policy of refusing to deal with *price cutters* is no more nor less than an invitation [to retailers] to agree [with each other as well as with the manufacturer] on . . . a *minimum* price . . . ." *Id.*, at 689. (Emphasis added.)

[6] *United States* v. *Parke, Davis & Co.*, 362 U. S. 29.

[7] I thought at the time *Parke, Davis* was decided (see my dissenting opinion in that case, 362 U. S., at 49) and continue to believe, that the result reached could not be supported on the majority's reasoning. I am frank to say, however, that I now consider that the *Parke, Davis* result can be supported on Professor Turner's rationale. See Turner, *supra*, n. 5, at 684–691. Further reflection on the matter also leads me to say that my statement in dissent to the effect that *Parke, Davis* had overruled the *Colgate* case was overdrawn, and further that I am not yet prepared to say that Professor Turner's rationale necessarily carries the total discard of *Colgate*.

even if combinations to fix maximum prices are as illegal as combinations to fix minimum prices the circumstances under which a combination to fix maximum prices may be inferred are different from those which imply a combination to keep prices up.

It was for this reason that in *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, the only case in this Court in which maximum resale prices have actually been held unlawful, the key question was whether there was an actual horizontal combination of manufacturers to impose on retailers a maximum resale price. The Court refused to hold that dictation of price ceilings to a single retailer by a single manufacturer was unlawful, but instead insisted upon, and found, a situation in which two manufacturers, in their common interest, combined to impose upon retailers a condition of doing business which they might not have been able to demand individually.

*Kiefer-Stewart*'s treatment of the combination requirement is instructive. Any manufacturer is at perfect liberty to set the prices at which he will sell to retailers, and in that way maximize his profits while lessening theirs. Competition, that is the threat that the purchasing seller will simply turn to another manufacturer, prevents the manufacturer from raising his prices beyond a certain point. It is *per se* unlawful, however, for two manufacturers to combine to raise their prices together, rendering each of them secure because the retailer or wholesaler has nowhere else to turn. From the manufacturer's viewpoint, putting a ceiling on the resale price may be simply an alternative means to the end of maximizing his own profits by lessening distribution costs: instead of squeezing the reseller from the bottom he squeezes from the top. The holding of *Kiefer-Stewart* was that the squeeze from the top, like the squeeze from

the bottom, was lawful unless by a combination of persons between whom competition would otherwise have limited the power to squeeze from either direction. No combination of the kind required in *Kiefer-Stewart* exists here, and the Court has found no sensible substitute theory of combination.

The Court's second difficulty in this case is to state why imposition of price ceilings is a *per se* unlawful restraint. The respondent offered as a defense the contention that since there was no competition between distributors to keep resale prices down, a fixed maximum price was in the interest of both the respondent itself and the public. The Court, recognizing that despite scattered dicta about maximum and minimum prices both being *per se* illegal there was here an alleged justification that would have to be faced on its merits, attempts to show that the defense may be disposed of without hearing evidence on it.

The Court has not been persuasive. The question in this case is not whether dictation of maximum prices is *ever* illegal, but whether it is *always* illegal. Petitioner is seeking, and now receives, a judgment notwithstanding the verdict of a jury that he had failed to show that the practice was unreasonable in this case. The best the Court can do is to list certain unfortunate consequences that maximum price dictation might have in other cases but was not shown to have here. Then, in rejecting the significant affirmative justification offered for respondent's practice, the Court merely says, "The assertion that illegal price fixing is justified because it. blunts the pernicious consequences of another distribution practice is unpersuasive." *Ante,* at 154. I shall ignore the insertion of the word "illegal," which merely assumes the conclusion. I cannot understand why, in deciding whether a practice is an unreasonable restraint of trade, the Court

finds it "unpersuasive" that the practice blunts pernicious attributes of an existing distribution system.

The Court's only answer is that the courts below did not consider whether the existing distribution system might itself be illegal. But even assuming that respondent can conceivably be penalized for failure to raise the question whether the distribution system, unchallenged by petitioner, was lawful, the Court's argument falls short. The Court has decided that exclusive territories and consequent market power can never be a justification for dictation of maximum prices because exclusive territories are sometimes unlawful. But they are neither always unlawful nor have they been demonstrated to be unlawful in this case.

It may well be that the mechanics of newspaper distribution are such that a city quite naturally divides itself into one or more relatively exclusive territories (sometimes called "paper routes"), giving each distributor a large degree of monopoly power. It is hardly farfetched to assume that a newspaper might be able to prove (if given the opportunity it is today denied) that rough territorial exclusivity is simply a fact of economic life in the newspaper distributing business, both because the nature of the enterprise dictates compactness of routes and because the number of distributors that a particular area can sustain is necessarily so small that they naturally fall into oligopolistic respect for each other's territories, and into a pattern of price leadership.

There is no question that the ideal situation, from the point of view of both the publisher and the public, is to have a very large number of distributors intensely vying with each other in both price and service. This situation, however, may be one that it is impossible to achieve in some, perhaps in all, cities. It seems quite possible that a publisher who does not want to do his

own distributing must live with the fact that there will always be a relatively small number of competing distributors, who consequently will be likely to fall into lawful but undesirable oligopolistic behavior—price leadership and territorial exclusivity.

Confronted by this situation, the publisher, who is competing with other publishers in, among other things, price and service to the public, will seek to provide efficient distribution service at the lowest possible price. These objectives would be realized by intense competition without the publisher's interference, but in the absence of such competition the publisher must take steps of his own.

The present respondent took two steps. First, it insisted on the right to approve each distributor. Naturally, since newspapermen are notoriously realistic, it referred to the acquisition of a distributorship as the purchase of a "route." Second, it set a maximum home delivery price and enforced it; the price could not be below the level that perfect competition would dictate without driving the distributors out of business and defeating the publisher's whole objective. Hence the price set cannot be supposed to have been unreasonable.[8] Respondent had no need to go to the extreme of cutting off distributors preferring to do a high-profit, low-volume business, and did not do so. It simply advertised the maximum home delivery price and created competition

---

[8] Reasonableness is also evidenced by the abundance of persons willing to distribute newspapers at or below the fixed ceilings. The point is not affected by the fact that the distributors willing to accept respondent's conditions were buying monopolies. The principal virtue of a monopoly is the power of the monopolist to charge supercompetitive prices. Hence it cannot be argued that the ceilings might have proved too low to attract buyers but for the fact that they were accompanied by monopoly power.

with any distributor not observing it. Today's decision leaves respondent with no alternative but to use its own trucks.

For the reasons stated in my Brother STEWART's opinion and those stated here, I would affirm the judgment below.

MR. JUSTICE STEWART, with whom MR. JUSTICE HARLAN joins, dissenting.

The respondent is the publisher of the only daily morning newspaper in St. Louis. The petitioner was one of some 170 independent distributors who bought copies of the paper from the respondent and sold them to householders. Each distributor had an exclusive territory subject only to the condition that his resale price not exceed a stated maximum. When the petitioner's price did exceed that maximum, the respondent allowed and indeed actively assisted another distributor to enter the petitioner's territory and compete with him. The Court today holds that this latter practice by the respondent subjected it to antitrust liability to the petitioner. I cannot understand why.

The case was litigated throughout by both parties upon the premise that the respondent's granting of an exclusive territory to each distributor was a perfectly permissible practice. Upon that premise the judgment of the Court of Appeals was obviously correct. For the respondent's conduct here was in furtherance of, not contrary to, the purposes of the antitrust laws. The petitioner was a monopolist within his own territory; he was the only person who could sell for home delivery the city's only daily morning newspaper. But for the fact that respondent provided competition above a certain price level, the householders would have been totally without protection from the petitioner's monopoly posi-

tion. The cases cited by the petitioner, such as *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, and *United States* v. *Parke, Davis & Co.,* 362 U. S. 29, did not involve monopoly products distributed through exclusive territories and are thus totally inapplicable here. The thrust of those decisions is that the reseller should be free to make his own independent pricing determination. But that cannot be a proper objective where the reseller is a monopolist.[1] To the extent that the respondent prevented the petitioner from raising his price above that which would have prevailed in a competitive market, the respondent's actions were fully compatible with the antitrust laws.[2]

But, says the Court, the original grant of an exclusive territory to the petitioner may have itself violated the antitrust laws. Putting aside the fact that this question was not briefed or argued either here or in the court below, I fail to understand how the illegality of the petitioner's exclusive territory could conceivably help his case. The petitioner enjoyed the benefits of his exclusive territory subject to the condition that he keep his price at or below a stated maximum. When he did charge more, the respondent took steps to force the petitioner's price down by introducing competition into his territory. If it was illegal in the first place for the petitioner to enjoy a *conditional* monopoly, I am at a loss to under-

---

[1] See Elman, "Petrified Opinions" and Competitive Realities, 66 Col. L. Rev. 625, 633 (1966).

[2] Because the major portion of the respondent's income derives from advertising rather than from sales to distributors, the respondent's self-interest is in keeping the retail price of the paper low in order to increase circulation and thereby increase advertising revenues. However, neither the petitioner nor the Court suggests that the maximum set by the respondent was less than the price that would have prevailed if there had been competition among the distributors.

stand how the respondent can be liable to the petitioner for not permitting him a *complete* monopoly.

The Court in this case does more, I think, than simply depart from the rule of reason.[3] *Standard Oil Co.* v. *United States*, 221 U. S. 1. The Court today stands the Sherman Act on its head.[4]

---

[3] See generally Elman, "Petrified Opinions" and Competitive Realities, 66 Col. L. Rev. 625 (1966). "It should be plain why there is a real danger of the abuse of the per se principle by those predisposed to offer mechanical or dogmatic solutions to legal problems. In every antitrust case there are two routes to a finding of illegality: critically analyzing the competitive effects and possible justifications of the challenged practice; or subsuming it under one of the per se rules. The latter route is naturally the more tempting; it is easier to classify a practice in a forbidden category than to demonstrate from the ground up, as it were, why it is against public policy and should be forbidden." *Id.*, at 627.

[4] "The Supreme Court shows a growing determination in its antitrust decisions to convert laws designed to promote competition into laws which regulate or hamper the competitive process." Bowman, Restraint of Trade by the Supreme Court: The Utah Pie Case, 77 Yale L. J. 70 (1967).