**KAPIOLANI MOTORS, LTD. and James Zukerkorn, Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION and General Motors Overseas Distributors Corporation, Defendants.**

**Civ. No. 2943.**

United States District Court
D. Hawaii.

June 10, 1969.

Damon, Shigekane & Char, Vernon F. L. Char, Honolulu, Hawaii. Offices of Joseph L. Alioto, Joseph L. Alioto, Maxwell M. Blecher, Joseph M. Alioto, San Francisco, Cal., for plaintiffs.

Martin Anderson, Jenks, Kidwell, Goodsill & Anderson, Honolulu, Hawaii, Morris M. Doyle, Craig McAtee, Terry

J. Houlihan, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants; Ross L. Malone, J. L. Russu, Detroit, Mich., of counsel.

## MEMORANDUM DECISION

PENCE, Chief Judge.

James Zukerkorn, president of Kapiolani Motors, Ltd., and that company, the sole Pontiac dealer on the Island of Oahu since 1939, and operating under a Dealer Selling Agreement with the defendant General Motors Corporation, have brought this complaint for money damages against General Motors and its General Motors Overseas Distributors Corporation, claiming that the two defendants conspired with Ford Motor Company, Inc. and Mike Salta Pontiac Incorporated to eliminate Kapiolani Motors from the Oahu Pontiac market.

Plaintiffs allege that General Motors designated Salta as a second Pontiac dealer on the Island of Oahu with the knowledge and consent of the co-conspirators for the express purpose and intent of eliminating Kapiolani Motors as a Pontiac dealer. Plaintiffs allege that this was done as a reprisal for the lobbying activities of Zukerkorn before the Hawaii Legislature in his endeavor to have legislation passed which would impose greater restrictions upon the activities of automobile manufacturers, in their relationship to dealers, than is presently afforded by 15 U.S.C. § 1222—Automobile Dealer Franchise Act. Plaintiffs charged that the designation of Salta as a second dealer on Oahu, for the reason above indicated, violated (1) Section 1 of the Sherman Act in that the conspirators engaged in a combination or conspiracy in restraint of trade and commerce in Pontiac automobiles in the Oahu market; (2) the Automobile Dealer Franchise Act, 15 U.S.C. § 1222, in that by establishing a second Pontiac dealership, defendants "have effectively terminated" plaintiffs' Dealer Selling Agreement; and (3) the Civil Rights Act, 42 U.S.C. § 1985, by appointing a second Pontiac dealer on Oahu "with the express purpose of eliminating and terminating" plaintiffs' dealership, and "as a reprisal for the [lobbying] activity of Mr. Zukerkorn", as above indicated.

Defendants moved to dismiss the complaint on the basis that plaintiffs failed to state a claim under any of the three acts. The motion has been fully briefed and argued.

■ Taking up plaintiffs' third alleged violation first, the defendants' motion in re the Civil Rights Act is GRANTED. The cases are unequivocal that the act was intended to give a cause of action to those individuals who by some action *taken under color or authority of state law* had been denied equal protection of the law. The statute has been consistently interpreted only to apply to actions taken under such state authority.[1] Although plaintiffs attempted to uphold their allegation of violation of this act in their brief, in oral argument their silence on this alleged violation was welcomed by the court. Plaintiffs failure to allege that state action was, somehow, involved in the facts set forth in the complaint is fatal to plaintiffs' claim under 42 U.S.C. § 1985.

■ Plaintiffs also have failed to state a claim under the Automobile Dealer Franchise Act ((2) above). The legislative history of this act shows that:

"Every action which reduces the dealer's equity does not give rise to a cause of action under this bill. The dealer is able to sue only where the manufacturer did not act in good faith in (1) terminating the franchise, (2) not renewing the franchise, and (3) performing or complying with the terms of the franchise. Therefore, the establishment of a new dealership by the factory, thus providing more competition for the dealer, would not give the dealer a right of action under this

1. Collins v. Hardyman, 341 U.S. 651, 661–662, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). See also, Henig v. Odorioso, 385 F.2d 491, 494–495 (3 Cir. 1967), cert. den. 390 U.S. 1016, 88 S.Ct. 1269, 20 L.Ed.2d 166 (1968).

bill." Hearings on H.R. 11360 and S. 3879 Before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 2d Sess. at p. 27 (1956)—

and the above interpretation was applied in American Motor Sales Corp. v. Semke, 384 F.2d 192 (10 Cir.1967).

█ All that the plaintiffs have here alleged is that the appointment of the new dealership was not made in good faith and has "effectively terminated * * * plaintiff's Dealer Selling Agreement." There is no factual allegation in the complaint to support even an inference that defendants' acts perforce *must* ultimately result in termination. Nothing more can be determined from the facts alleged in the complaint than that a new dealership was established— in bad faith—which would provide more competition for the plaintiffs in the Oahu Pontiac market. While sketch pleading is now the general rule, nevertheless parties must in their complaint state facts from which it is apparent from the face of the complaint that they have stated a *prima facie* claim upon which recovery could be had. Here, in re 15 U.S.C. § 1222, plaintiffs' complaint is lacking in just those necessary factual allegations, and the motion to dismiss plaintiffs' claim under that section must be GRANTED.

█ The last basis ((1) above) upon which the plaintiffs rely for recovery is that beginning about 1966 General Motors "and co-conspirators [presumably this includes Ford] have entered into a contract [logically this would exclude Ford but include Salta] in unreasonable restraint of * * * trade and commerce in Pontiac automobiles and have engaged in a combination and conspiracy in restraint of said trade [presumably that also would exclude Ford], in violation of Section 1 of the Sherman Act." (Complaint, p. 5.) All parties insist that commerce in Pontiacs at a retail level on Oahu is a sufficiently identifia-

ble part of interstate commerce to be susceptible of restraint.[2]

There is nothing in the complaint to indicate other than that the plaintiffs had a "monopoly" of the Oahu market in Pontiac automobiles for almost thirty years, presumably a benign monopoly, but a monopoly nevertheless. The appointment of a second dealer in that market, on the face of the complaint, would but break up that monopoly and increase competition.

For the purpose of this motion to dismiss, plaintiffs' allegation that General Motors entered into the contract with Salta, designating it as a Pontiac dealer on Oahu, for the sole purpose of punishing Zukerkorn, i. e., that the motivation for its contract with Salta was punitive, is assumed to be true. Although plaintiffs allege that they have suffered "damages resulting from loss of * * * past profits", the basic thrust is that the establishment of the second Pontiac dealership will, *in futuro*, result in termination, i. e., elimination, of Kapiolani Motors as a viable Pontiac dealer. The basic thrust of plaintiffs' argument is that because the Sherman Act was intended to strike down nascent as well as accomplished restraints of trade, the bare bones allegation that the designation of a second dealership on Oahu had caused "damages resulting from loss of goodwill, loss of past profits, loss of future profits, and diminution in the value of its business and property", was sufficient to state a cause of action under Sherman 1. As was pointed out by the defendants, competition in the Pontiac market would not be decreased by the appointment, but rather increased— normally a desirable objective under the antitrust laws. Although it was argued by plaintiffs, nowhere was there any allegation—even if one could be made— that the Island of Oahu could not successfully support two viable Pontiac dealers. The court could take judicial notice of the fact that the population of Oahu in 1939 when Kapiolani Motors

---

2. Cf. Mt. Lebanon Motors, Inc. v. Chrysler Corporation, 283 F.Supp. 453, 460 (W.D.Penn. 1968).

was started was about 250,000, and in 1968 was about 650,000.

Plaintiffs base their argument on three cases: Poller v. Columbia Broadcasting, 368 U.S. 464, 82 S.Ct. 486, 7 L. Ed.2d 458 (1962); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed. 2d 998 (1968); and Mt. Lebanon, *supra*, n. 2. In *Poller*, station WCAN, a UHF TV station in Milwaukee, was affiliated with the CBS network. CBS purchased WOKY, a competing UHF station in Milwaukee, and cancelled WCAN's network affiliation, thereby forcing the plaintiff to sell WCAN to CBS at a forced sale. Plaintiff's allegation was that this was done pursuant to a conspiracy to restrain and monopolize trade in the TV broadcasting business in the Milwaukee area. The Court said:

> "It may be that CBS by independent action could have exercised *its granted right* to cancel WCAN's affiliation * * * and independently purchased its own outlet in Milwaukee." (Emphasis added.) 368 U.S. at 468, 82 S. Ct. at 488.

Then continued:

> "However, if such a cancellation and purchase were part and parcel of unlawful conduct or agreement with others or were conceived in a purpose to unreasonably restrain trade, control a market, or monopolize, then such conduct might well run afoul of the Sherman Law." 386 U.S. at 468–469, 82 S.Ct. at 489.

It must be noted that in *Poller* there was an actual termination of the affiliation of WCAN by CBS. It is obvious that the Court considered this a material fact in concluding that Poller had stated a cause of action. In *Poller*, the Court reaffirmed its holding in Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), that even though the public received the same service, a violation of the antitrust laws could nevertheless exist. In the instant case, however, plaintiff's dealership has not been cancelled; all that has been changed is that more competition has been injected into the Pontiac mar-

ket on Oahu. On the face of the complaint, therefore, it would appear that the consumer should receive even more Pontiac sales service than before. It must be noted in passing that *Poller* was a 5–4 decision and Justice Harlan, in dissent, characterized it as:

> "* * * one of those cases * * * where injury resulting from normal business hazards is sought to be made redressable by casting the affair in antitrust terms." 368 U.S. at 474, 82 S.Ct. at 491.

This court is unable to agree with plaintiffs' argument that *Albrecht, supra*, sustains their contention that they have stated a cause of action under Sherman 1. That case was concerned with and determined upon what the court found to be an illegal combination to fix prices. Beginning with page 149 of 390 U.S., at page 871 of 88 S.Ct. and continuing to the end of the opinion of the Court on page 154, 88 S.Ct. on page 874, each and every page concerns itself with the illegality of a combination to fix prices—nothing more. Even the dissents concern themselves with the majority's finding of a *per se* price fixing combination out of the facts of the case. Nowhere have plaintiffs here alleged any price fixing on the part of General Motors and/or its co-conspirators.

In *Mt. Lebanon, supra*, the plaintiff's franchise was terminated by Chrysler, who wanted to set up a "dealer enterprise" (DE) dealer in Alleghany County, Pennsylvania. A DE dealership was one wholly-owned and/or financed by Chrysler, or 75% owned by Chrysler and 25% by the dealer—with Chrysler lending the dealer half of the 25% investment, and with, of course, the dealership under Chrysler control. At the time of termination there were two dealers in Alleghany County, but after termination of the plaintiff there was only the Chrysler-controlled DE dealership. The court there said:

> "We are aware of no authorities indicating that the facts alleged * * * would constitute a violation *per se* [of Sherman 1]. They may well, howev-

er, support a charge of unreasonable restraint." 283 F.Supp. at 458—

and continued:

"To eliminate competition by putting out of business one dealer after another individually, by excluding competitors from any substantial market, constitutes a restraint of trade, even if there is no general effect upon the economy as a whole. International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947) * * *; Klor's, Inc. [supra] * * *." 283 F.Supp. at 459.

The facts in *Mt. Lebanon* are obviously markedly different from the facts pled here. In argument, plaintiffs' most able counsel could but say of *Mt. Lebanon* and *Poller*: "I can't point out to you any specific language [supporting plaintiffs' complaint] in any specific case with the possible exception [of that which] I call the breath of fresh air in Mt. Lebanon." And counsel continued with what this court feels illustrates the fatal factual flaw in both plaintiffs' Sherman Act 1 count and Automobile Dealer Franchise Act count: "And ultimately we come to the. realization in terms of policy that this powerful manufacturer hasn't got. an unabridged right to terminate * * * to give [it] the right to say we are going to cut you off because you don't do what we tell you to do." (Tr. 5/19/1969, pp. 38–39.) The weakness is manifest. There have as yet been no factual allegations manifesting cut off or termination. The optimum allegations of fact in plaintiffs' complaint is that the establishment of a second Pontiac dealership has "effectively terminated said plaintiff's Dealer Selling Agreement." It is conceded, however, that this is not a statement of present fact. There has been no notice of termination, or actual termination. From the pleadings, termination, if it ever takes place, is but possibly prospective.

This court feels that the comment of Professor Phillip Areeda in his analysis of Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683 (1918) is most pertinent:

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." Antitrust Analysis— Problems, Text, Cases, at 259–60.

Measured by the above standards, plaintiffs' pleading falls short of stating a cause of action under Sherman 1.

In sustaining defendants' motion to dismiss, as the court must on the state of the pleadings, this court does not intend to indicate that plaintiffs could or could not state a cause of action on the facts indicated in argument. Nor does the court mean to infer that at a later date with a change of factual allegations the plaintiffs might not state a cause of action under . the antitrust laws and/or under 15 U.S.C. § 1222. All that is held is that on the pleadings as they now stand, defendants' motion to dismiss is granted, without prejudice.

Plaintiffs will be allowed twenty (20) days in which to amend their complaint. If not so amended, this order shall thereupon become final.