46126. EXECUTIVE TOWN & COUNTRY SERVICES, INC. v.
YOUNG et al.
(376 SE2d 190)

MARSHALL, Chief Justice.

Executive Town & Country Services, Inc. ("Town & Country") brought this action against the City of Atlanta and city officials, for damages, declaratory judgment, and injunctive relief from enforcing § 14-8001 et seq. of the Code of Ordinances of the City of Atlanta, and specifically §§ 14-8020 (g) and 14-8031. Section 14-8020 (g) regulates the fares which licensed limousine service companies may charge for trips to and from the Atlanta Hartsfield Airport, specifying both minimum and maximum fares. Section 14-8031 prohibits the advertising of any fares that are not in compliance with the provisions of § 14-8020 (g).

Town & Country, which was a duly licensed transportation (limousine) company operating within the corporate limits of Atlanta, alleged that the city had revoked its license for violations of the city ordinance and had disseminated a letter to the Atlanta business community stating that any limousine company violating the ordinance would be subject to the sanctions of seizure of vehicles and summary placing of passengers out on the street to obtain other transportation. Town & Country contends that it is regulated by the Georgia Public Service Commission, and, therefore, that the city ordinance sections in question are violative of Art. III, Sec. VI, Par. IV of the Constitution of Georgia of 1983, which provides that a local government may only enact laws which do not conflict with general state law.

The trial court granted the city's motion for summary judgment,

from which judgment Town & Country appeals. We reverse.

1. As the trial court held, Town & Country would come within the definition of "motor common carrier" in OCGA § 46-1-1 (7) (B),[1] so as to be subject to regulation by the Public Service Commission (PSC), except for the fact that it undisputedly comes within the exception set forth in OCGA § 46-1-1 (7) (C) (xiii)[2] and may, as a matter of fact, come within the exception in subsection (7) (C) (ii).[3] Town & Country's obligations under subsection (7) (C) (xiii), supra, of registration, identification of vehicles, and compliance with the commission's liability-insurance and vehicle-safety rules, do not constitute such regulation as would prohibit regulation by the city, as this would nullify the legislative intent of this subsection, i.e., to exempt such motor common carriers from regulation by the commission. *Maner v. Dykes*, 55 Ga. App. 436, 438-9 (190 SE 189) (1937), is not authority to the contrary.

Thus, the city code is not unconstitutional on the contended ground that it is preempted by the state law. Moreover, the city has authority to regulate the activities of Town & Country in the exercise of its police powers by virtue of its home-rule power. OCGA § 36-35-3; Art. III, Sec. VI, Par. IV (a) of the Constitution of Georgia of 1983. Although Hartsfield Airport is not within the city's boundaries, OCGA § 6-3-27 specifically grants the city the right to enforce police regulations at the airport which the city operates, maintains and controls.

The issue of the city's authority to regulate Town & Country's rates was resolved in the city's favor in Town & Country's prior federal court action, *Executive Town & Country Services, Inc. v. City of Atlanta*, 789 F2d 1523, 1529 (10) (11th Cir. 1986), which held:

In the case at bar, there is no doubt that the City of Atlanta

---

[1] "[E]very person owning, controlling, operating, or managing any motor propelled vehicle, and the lessees, receivers, or trustees of such person, used in the business of transporting for hire of persons or property, or both, otherwise than over permanent rail tracks, on the public highways of Georgia as a common carrier."

[2] "Vehicles transporting not more than 15 persons for hire, except that any operator of such a vehicle is required to register the exempt operation with the commission, register and identify any of its vehicles, and become subject to the commission's liability insurance and vehicle safety rules."

[3] "Taxicabs, drays, trucks, buses, and other motor vehicles which operate within the corporate limits of municipalities and are subject to regulation by the governing authorities of such municipalities. This exception shall apply to taxicabs and buses even though such vehicles may, in the prosecution of their regular business, occasionally go beyond the corporate limits of such municipalities, *provided that they do not operate to or from fixed termini outside of such limits* and to any dray or truck which operates within the corporate limits of a city and is subject to regulation by the governing authority of such city or by the commission and which goes beyond the corporate limits only for the purpose of hauling chattels which have been seized under any court process. . . ." (Emphasis supplied.)

was authorized by the State of Georgia to regulate the rates for public transportation. See OCGA §§ 46-7-18; 46-7-19. Historically the city has regulated public transporters pursuant to the police power granted the city by the State of Georgia. *Airport Taxi Cab Advisory Committee v. City of Atlanta*, 584 FSupp. at 963. Thus, the City of Atlanta has exercised its delegated power pursuant to the state authorization, and therefore, is entitled to the exemption from the Sherman Act challenge. *Town of Hallie v. City of Eau Claire*, ___ U.S. ___ (105 SC 1713, 85 LE2d 24) (1985). [Footnotes omitted.]

Town & Country contends that the federal court case is not binding in the present case because OCGA § 46-1-1 was amended after the federal case was decided on May 23, 1986, so as to place carriers such as Town & Country under the regulatory jurisdiction of the PSC. We disagree. OCGA § 46-1-1 (7) (C) (xiii), supra, exempts Town & Country from PSC regulation, and was added by Ga. L. 1986, p. 1283, effective April 9, 1986.

2. The remaining issue is whether or not the city code, in providing minimum and maximum fares for the class of carriers in which Town & Country is included, has prescribed "just, reasonable, and nondiscriminatory rates and charges," as the city is required to do by OCGA § 46-7-18, supra, acting pursuant to state policy. See OCGA § 36-65-1.[4] This issue is raised in Counts 4 and 5 of the complaint, in which Town & Country alleges that such city-code provisions — and specifically the minimum-rate provisions — are unclear, indefinite, contradictory, vague, void, unenforceable, unreasonable, arbitrary, irrational, unconstitutional, and unsupported by any evidence.

By the provisions of OCGA §§ 36-65-1, supra, and 36-65-2,[5] the city is made specifically immune from antitrust liability — the setting of either maximum or minimum rates being a per se violation of the antitrust law. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 348 (102 SC 2466, 73 LE2d 48) (1982); *Albrecht v. Herald Co.*, 390 U.S. 145, 151, 152 (88 SC 869, 19 LE2d 998) (1968). Thus, the issue must be resolved with reference to the following precepts of state law.

Art. III, Sec. VI, Par. V of the Constitution of Georgia of 1983

---

[4] "It is declared by the General Assembly of Georgia that in the exercise of powers specifically granted to them by law, local governing authorities of cities and counties are acting pursuant to state policy."

[5] "This chapter is intended to articulate clearly and express affirmatively the policy of the State of Georgia that in the exercise of such powers, such local governing authorities shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia."

provides:

> (c) The General Assembly shall not have the power to authorize any *contract or agreement* which may have the effect of or which is intended to have the effect of defeating or lessening competition, or encouraging a monopoly, which are hereby declared to be unlawful and void. [Emphasis supplied.]

This provision applies to governmental departments receiving their power from the General Assembly. 1980 Op. Att'y Gen. No. 80-2. The provision is an embodiment of the common-law rule which prohibited contracts in general restraint of trade, and thus it has the same meaning as OCGA § 13-8-2, which states that contracts in general restraint of trade cannot be enforced. 1960-61 Op. Att'y Gen. p. 429. While contracts in general restraint of trade are void, contracts in partial restraint of trade are valid if they are reasonable and not injurious to the public interest; this applies to public-service corporations as well. 1960-61 Op. Att'y Gen. p. 429; *Britt v. Davis*, 239 Ga. 747, 748 (1) (238 SE2d 881) (1977) and cit. Reasonableness is a question of law for determination by the court. *McNease v. Natl. Motor Club of America, Inc.*, 238 Ga. 53 (2) (231 SE2d 58) (1976) and cits.

While the above principles are limited expressly to contracts and agreements, they nevertheless illustrate the state policy against "defeating or lessening competition, or encouraging a monopoly." More specifically, this Court has held with regard to city ordinances:

> [H]uman dignity and individual freedom demand that one engaged in a lawful business injurious to no one must not be arbitrarily prevented from the legitimate prosecution of his business by city ordinances which set up trade barriers solely for the purpose of protecting a resident against proper competition. If free enterprise is to mean more than mere words, it must not become the victim of arbitrary and discriminatory legislation . . . . The most destructive enemy to free enterprise and individual liberty comes dressed in attractive garments, and is covered with a sugar coating in order that the victim will accept it unaware of its future destruction of his own freedom.

*Moultrie Milk Shed, Inc. v. City of Cairo*, 206 Ga. 348, 352 (2) (57 SE2d 199) (1950). A similar rationale is set forth in 56 AmJur2d 391, Municipal Corporations, etc., § 365:

> [S]pecific municipal regulations for one kind of business, which may be necessary for the protection of the public, can

never be the just ground of complaint because like restrictions are not imposed upon other businesses of a different kind. It is common, however, for certain classes of citizens, those engaged in a particular business, to appeal to the government — national, state, or municipal —to aid them by legislation against another class of citizens engaged in the same business but in some other way. This class legislation, when indulged in, seldom benefits the general public, but nearly always aids a few for whose benefit it is enacted, not only at the expense and to the detriment of the many for whose benefit all legislation should be, in a republican form of government, framed and devised. This kind of legislation ordinarily receives no encouragement at the hands of the courts, and will be upheld only where it is strictly within the legitimate power of the municipal legislature.

There is a line of authority demonstrating this Court's consistent holding that minimum-price/fare legislation is authorized without violating due process, among other requirements, only when it addresses a business or property that is "affected with a public interest." See, e.g., *Strickland v. Ports Petroleum Co.*, 256 Ga. 669 (353 SE2d 17) (1987) and cits.

For an industry or any particular business to become "affected with a public interest," its business or its property must be so applied to the public as to authorize the conclusion that it has been devoted to a public use and thereby its use, in effect, granted to the public.

*Harris v. Duncan*, 208 Ga. 561, 564 (67 SE2d 692) (1951).

Negatively, it does not mean that a business is affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance.

Id., p. 564. "Affected with a public interest" has been defined alternatively as "subject to the exercise of the police power." *Bohannon v. Duncan*, 185 Ga. 840, 842 (2) (196 SE 897) (1938) and cit. (We note that in at least one instance, this Court has applied a different test to maximum-price-fixing legislation, that being whether the law is seen to have a reasonable relation to a proper legislative purpose, and is neither arbitrary nor discriminatory.) *State v. Major*, 243 Ga. 255, 257 (253 SE2d 724) (1979) and cits.

In the federal-court action, 789 F2d 1523, supra at 1527, fn. 8, the court noted that the city argued that the fare regulation ensures:

(1) that each of (the different) modes of transportation can find a niche in which to fit in the city's transportation network; (2) that everyone within the city, no matter what his level of affluence, has affordable transportation available; (3) that the operators of each type of transportation (must) earn enough to permit them to meet the operational requirements (e.g., insurance, maintenance, etc.) which have been set by the city; and (4) that each of these different modes will be able to attract the custom of a sufficient number of patrons to maintain its economic viability.

The federal court, at p. 1527, declined to substitute its judgment for that of the city council as to whether the legislative facts on which the classification is apparently based could reasonably be conceived to be true — this in spite of its agreement with the conclusion of the district attorney that the city's reasons for imposing the minimum fares are "weak," although the burden imposed on interstate commerce by the regulations is not in excess of the putative benefits to be gained by the city. (They based this conclusion on the lack of evidence produced with respect to the burden imposed on interstate commerce.) In fn. 7 on p. 1526, the court noted that

at oral argument, Town & Country argued that § 14-8020 (g) . . . established a minimum fare which was too high for the limousine service to charge its passengers without losing business. Town & Country, however, conceded that a lower minimum fare would not be objectionable. If, indeed, Town & Country is only concerned with the actual amount established as a minimum fare by the city, this court will not substitute its judgment for that of the legislature.

In contrast, in the present action, as we have noted hereinabove, the complaint specifically attacks the minimum-fare provisions of the ordinance on numerous grounds, including that they are unreasonable, arbitrary, irrational, unconstitutional, and not supported by any evidence. Although the trial court correctly held that the city was not preempted by the state law, the order did not expressly address the issues raised by the complaint as to the validity of the particular portions of the ordinance attacked. Absent an express finding thereon, this Court cannot assume that the issue was adjudicated. Therefore, genuine issues of material fact remain as to the validity of the sections of the ordinance in question, and the trial court erred in granting the city's motion for summary judgment.

*Judgment reversed. All the Justices concur.*

DECIDED FEBRUARY 15, 1989.

Carr, Tabb & Pope, W. Pitts Carr, Eric E. Huber, J. Renee Kastanakis, for appellant.

Hurt, Richardson, Garner, Todd & Cadenhead, Steven E. O'Day, Nina Radakovich, Marva Jones Brooks, Elizabeth F. Allen, for appellees.