PANTS 'N' STUFF SHED HOUSE,
INC., Plaintiff,

v.

LEVI STRAUSS & CO., Defendant.

No. Civ–84–1375T.

United States District Court,
W.D. New York.

April 25, 1985.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for plaintiff; Lewis Kaplan, New York City, John Stuart Smith, Rochester, N.Y., of counsel.

Harter, Secrest & Emery, Rochester, N.Y., Heller, Ehrman, White & McAuiffe, San Francisco, Cal., for defendant; Kenneth A. Payment, Rochester, N.Y., Robert J. Vizas, San Francisco, Cal., of counsel.

## DECISION and ORDER

TELESCA, District Judge.

### I.  Introduction

This is an antitrust action brought by a Rochester based retailer (and sometime wholesaler) of sportswear, against a clothing manufacturer which refuses to allow its products to be sold by anyone at wholesale.  Defendant has moved to dismiss the action on various grounds, and has moved to strike several paragraphs in the complaint as irrelevant and prejudicial.  Plaintiff has moved for a preliminary injunction compelling defendant to continue supplying it at least as many pair of blue jeans as it sold to plaintiff between November, 1983 and November, 1984.

By this decision, I deny plaintiff's motion for a preliminary injunction, along with defendant's motion to strike certain paragraphs from the complaint and defendant's motion to dismiss for lack of standing. Pursuant to Fed.R.Civ.P. 12(b), I am converting defendant's motion to dismiss plaintiff's Sherman Act Section 1 claim into a motion for summary judgment, and ordering that the parties submit affidavits, deposition testimony, and other relevant evidence by June 1, 1985.  Defendant's motion to dismiss plaintiff's Sherman Act Section 2 claim is granted.

### II.  Facts

Levi Strauss & Company (Levi) grew from a small family owned business at the end of World War II to the nation's largest apparel manufacturer today.  It claims that the "cornerstone" of this growth has been Levi's long-standing publicly announced policy of selling only to retailer customers of suitable quality.  Levi refers to this as its "customer selection" policy; plaintiff refers to this as Levi's "customer restriction" policy.

Plaintiff, Pants 'N' Stuff Shed House, Inc. (Shed House) was founded in 1969 in Rochester, New York by Seymour and Sam Tesler.  It grew from one retail store in the Rochester area to over 20 retail clothing stores in New York, Pennsylvania and Vermont.  Levi products have been the mainstay of Shed House's retail business since 1970.

Shed House is also in the business of selling clothing at wholesale.  It entered the wholesale business during the 1970's, allegedly as a result of Levi's refusal to accept returns of overstocked merchandise or to cancel orders.  Thereafter Shed House dealt in wholesaling on a regular basis and became heavily dependent on the income from it, to such an extent that it claims it is likely to be forced out of business if Levi is permitted to cut off Shed House's supply of goods for its wholesale business.

Since World War II, Levi has developed its "retailer only" distribution policy by selecting retail outlets for its merchandise and eliminating any wholesalers.  It claims to derive several benefits from this distribution system, including improved brand image through selection of distribution channels, improved flow of information from retailers concerning current market demands, and increased retailer good will. It has diligently attempted to avoid any wholesaling of its products by others.  Recently, it has developed a "light signature" surveillance technique, encoding numbers on its jeans which enable it to trace the source of any jeans found at an unauthorized retail location.

If the light signature program discovers a pair of jeans at an unauthorized retail location (in Levi's parlance, a light signature "hit"), the source of the jeans is then identified.  Although Levi officials have indicated that one or two light signature

"hits" would arouse only curiosity or suspicion, a pattern of light signature hits results in Levi's termination of shipments of jeans to the retailer identified as the source of the jeans, or else a reduction in shipments to the level identified by Levi as sufficient to satisfy the retail needs of that retailer. Levi also threatens to and does terminate its own salespeople who knowingly sell to retailers who "divert" merchandise.

There is no indication in the record thus far that anyone other than Levi's employees and agents operates the light signature system or takes any enforcement action against a retailer suspected of diverting Levi products. Rather, the record indicates that Levi salespeople are directed to visit unauthorized retailers occasionally, purchase a pair of Levi's jeans if that retailer is selling them, and send the jeans to Levi or its agent for identification of their source.

In June, 1983, Levi's national sales manager for the Jeanswear Division wrote to Shed House, saying that Levi had discovered goods sold to Shed House in unauthorized accounts and therefore was suspending sales to it. By August, 1983, Levi resumed sales, but imposed a ceiling on the quantity of jeans it would sell to Shed House in order to prevent Shed House from selling Levi jeans at wholesale. According to Shed House, both Levi and Shed House ignored the ceiling from August, 1983 until October, 1984 when Levi again threatened to cut off Shed House because goods sold to Shed House were being retailed elsewhere. After Shed House informed Levi that it would bring this lawsuit unless an amicable resolution were reached, Levi terminated all sales to Shed House. Levi later agreed to meet Shed House's retail needs during this litigation.

## DISCUSSION

### I. Sherman Act, Section 1

The nub of plaintiff's complaint, and the basis for its preliminary injunction motion, is its contention that Levi's anti-diversion policy and its actions in this lawsuit violate Section 1 of the Sherman Act. 15 U.S.C. Section 1. Section 1 of the Sherman Act prohibits any "contract, combination ... or conspiracy in restraint of trade ...". Because it requires that there be a "contract, combination ... or conspiracy", Sherman Act Section 1 does not proscribe independent action by a manufacturer; a manufacturer generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468 (1919).

Plaintiff relies on cases such as *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) and *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and argues that a "combination" may come about if a manufacturer announces its policies to its customers and then secures its customers' acquiescence in those policies by threats of termination or other coercive tactics. The facts as brought out on plaintiff's preliminary injunction motion, however, do not indicate to me that this case can be analogized to *Parke, Davis* or *Albrecht*. Accordingly, I am denying plaintiff's motion for a preliminary injunction on the ground that it does not raise sufficiently serious questions going to the merits to make them a fair ground for litigation. *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Because this factual information was outside of the complaint, however, I am not granting defendant's motion to dismiss. Rather, pursuant to Fed.R.Civ.P. 12(a), I am treating the motion as one for summary judgment. All parties are directed pursuant to Rule 12(b) to present all material made pertinent to such a motion by June 1, 1985.

In both *Parke, Davis* and *Albrecht*, unlike the present case, there were other parties with whom the manufacturer had conspired in an effort to force a retailer to comply with fixed prices. Shed House's

reliance upon *Parke, Davis* in particular is misplaced. The unauthorized "combination" with retailers is described by the Supreme Court as follows:

> With regard to the retailers' suspension of advertising, Parke, Davis did not rest with the simple announcement to the trade of its policy in that regard followed by a refusal to sell to the retailers who would not observe it. First it discussed the subject with Dart Drug [a large retailer which earlier had been cut off by Parke, Davis for advertising and selling Parke, Davis products at prices below the suggested minimum retail prices]. When Dart indicated willingness to go along the other retailers were approached and Dart's apparent willingness to cooperate was used as the lever to gain their acquiescence in the program. Having secured those acquiescences Parke, Davis returned to Dart Drug with the report of that accomplishment. Not until all this was done was the advertising suspended and sales to all the retailers resumed. In this manner Parke, Davis sought assurances of compliance and got them, as well as the compliance itself. It was only by actively bringing about substantial unanimity among the competitors that Parke, Davis was able to gain adherence to its policy. It must be admitted that a seller's announcement that he will not deal with customers who do not observe his policy may tend to engender confidence in each customer that if he complies his competitors will also. But if a manufacturer is unwilling to rely on individual self-interest to bring about general voluntary acquiescence which has the collateral effect of eliminating price competition, and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid such price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. The product then comes packaged in a competition-free wrapping—a valuable feature in itself—by virtue of concerted action induced by the manufacturer. The manufacturer is thus the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Act.

362 U.S. at 46–47, 80 S.Ct. at 512–13.

In the present case, however, I have seen no evidence to date that Levi either conspired with anyone else, or used anyone else's compliance as a "lever", in its efforts to force Shed House to comply with Levi's announced anti-diversion policy. Rather, it appears from the facts brought out so far that Levi brings stringent measures to bear against a retailer *individually* when Levi learns that the retailer has been diverting Levi's merchandise, which is a permitted practice under *Monsanto, supra.* Thus, the evidence indicates that Levi falls within the "limited dispensation which [Colgate] confers". *United States v. Parke, Davis & Co., supra,* 362 U.S. at 46, 80 S.Ct. at 512, *citing Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953).

I invite the parties to bring to my attention in their summary judgment motion papers any information already filed with this Court, or any further information, regarding the extent to which Levi contracted, combined, or conspired with any person [other than a member of its own sales force] in its efforts to force Shed House to adhere to its anti-diversion policy.

## II. Sherman Act, Section 2

Plaintiff also alleges in its complaint (although not on its preliminary injunction motion) that Levi violated Sherman Act Section 2 by conspiring with its dealers to monopolize the manufacture and sale of jeans or submarkets thereof. Levi responds that Shed House has failed to allege either a specific intent to destroy competition or monopolize, or a dangerous probability of successfully monopolizing a relevant market, both of which are unquestionably elements of an "attempted monopolization" claim. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Company,* 614 F.2d 832, 841 (2d Cir.1980). Shed House argues, however, that these elements are

not required in a "conspiracy to monopolize" claim, but that such a claim requires allegations only of (1) a conspiracy, (2) directed at an appreciable part of interstate commerce, and (3) undertaken with the specific intent of achieving monopoly power. *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir.1961). Shed House also argues that, to the extent it is required to do so, it has sufficiently alleged a "relevant market", *i.e.*, the manufacture and sales of jeans, as well as a specific intent of monopolizing that market or submarkets thereof.

I agree with Levi that Shed House has failed to sufficiently allege a dangerous probability of success, and that Shed House's Sherman Act Section 2 claim ought to be dismissed for that reason. The Second Circuit may have implied that an allegation of a dangerous probability of success was not required in *United States v. Consolidated Laundries Corp., supra*, but I believe that such an allegation is now required. *See, Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649, 668 (S.D.N.Y.1980), *aff'd.*, 697 F.2d 495, 496 (2d Cir.1983); *Consolidated Terminal Systems, Inc. v. I.T.T. World Communications, Inc.*, 535 F.Supp. 225, 229 (S.D.N.Y.1982). Shed House does allege in paragraph 7 of its complaint that Levi is the leading and dominant manufacturer of jeans in the United States, and that Levi's share of sales of jeans approximates, on information and belief, 25% of that market. Nevertheless, the allegation of a 25% market share is insufficient to state a claim that there is a dangerous probability of successful monopolization. *See, Levitch, supra*, 495 F.Supp. at 668 (allegation of a one-third market share held insufficient as a matter of law to state a claim of dangerous probability of successful monopolization); *see also, World Arrow Tourism Enterprises v. Trans-World Airlines*, 582 F.Supp. 808, 811–12 (S.D.N.Y.1984) (allegation that defendant together with two other airlines dominated the market for air transportation between the United States and Italy is legally insufficient allegation of market share to state a Section 2 claim).

Accordingly, Levi's motion to dismiss plaintiff's Section 2 claim is granted.

### III. Defendant's Motion to Strike Complaint Paragraphs

Levi has also moved under Fed.R. Civ.P. 11 to strike paragraphs "Eight" through "Eleven" of Shed House's complaint as irrelevant and prejudicial. These paragraphs are grouped under the subheading "Levi's Retail Price Maintenance Programs", and allege that Levi has (since at least 1970) attempted to stabilize the resale prices of its jeans by various means, many of which were the subject of a Federal Trade Commission proceeding instituted in May, 1976 and terminated with a consent order.

Although Levi has argued that these allegations are irrelevant and prejudicial, Levi itself has already relied on, *inter alia*, the transcripts from the F.T.C. proceeding in support of its position in the instant litigation. Under the circumstances, I am hard-pressed to find that the F.T.C. proceedings, and Levi's past practices addressed in those proceedings, are irrelevant in this case. If the presence of these paragraphs in the complaint leads to discovery requests from Shed House which Levi believes to be overbroad, Levi should bring this to the attention of the Magistrate who has the responsibility to monitor discovery.

### IV. Standing

Levi has also moved to dismiss the complaint on grounds that Shed House lacks standing to challenge a policy which allegedly causes artificially high retail prices, when Shed House is not a retail customer affected by any high retail prices which would result from Levi's conduct. The policy being challenged, however, although it is alleged to have the effect of stabilizing prices at an artificially high level, is a policy of limiting retail outlets by refusing to allow retailers to sell to other retailers. Shed House, which has sold to other retailers and would like to continue

to do so, is directly harmed by such a policy. Accordingly, Levi's motion to dismiss for lack of standing is denied.[1]

## CONCLUSION

From the facts before me thus far, it appears that Levi Strauss and Company has independently enforced its policy of selling its products only to retailers who resell to the general public. Such independent action by a manufacturer is not prohibited by Section 1 of the Sherman Act, since "a manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently". *Monsanto, supra,* 104 S.Ct. at 1469. Accordingly, I deny Shed House's request for a preliminary injunction which would compel Levi to continue to supply Shed House sufficient quantities of jeans so that Shed House could in turn sell jeans to other retailers. I will not dismiss this action, however, until Shed House has had an opportunity to submit whatever proof it can find in support of its claim that Levi was not acting independently when it took action against Shed House for wholesaling Levi's jeans.

ALL OF THE ABOVE IS SO ORDERED.

---

1. Shed House also sues under the Donnelly Act, New York General Business Law Section 340 et seq., which it alleges is broader than the Sherman Act because it prohibits "arrangements" in restraint of trade as well as combinations or conspiracies. The parties have not fully briefed this Court on the Donnelly Act, and I do not address it in this decision. For the benefit of the parties, I note that should summary judgment later be granted to defendant on the Sherman Act Section 1 issue, the Donnelly Act claim most likely would be dismissed without prejudice to its being refiled in state court. Should summary judgment not be granted to defendant, the Donnelly Act claim would then be addressed by this Court.